388 So.2d 1155 (1980)
STATE of Louisiana
v.
David Joseph SYLVESTER.
No. 66395.
Supreme Court of Louisiana.
September 3, 1980.
Rehearing Denied October 20, 1980.[*]
*1156 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Timothy W. Cerniglia, Louise S. Korns, J. Kevin McNary, Asst. Dist. Attys., for plaintiff-appellee.
Robert Glass, Glass & Reed, New Orleans, for defendant-appellant.
LEMMON, Justice.
Defendant's appeal urges two grounds for reversal of his conviction for first degree murder and sentence to life imprisonment.
Prior to the murders in this case defendant had been indicted for possession of heroin with intent to distribute, a crime with a mandatory penalty of life imprisonment. Paulette Royal and Eddie Smith, the murder victims in this case, were to be system and intent witnesses for the prosecution in the drug trial, which was set for July 22, 1976. Upon defendant's motion Smith was produced for pretrial interview on July 20. Later that day Nelson Davis, accompanied by Jessie Ford and another man, entered the motel room occupied by Smith and Miss Royal, and shot and killed both prospective witnesses.
The prosecution's theory of the case was that defendant had hired Davis to kill the witnesses. At trial the prosecution based its case on evidence relating to motive and on the testimony of Ford, to whom immunity had been granted.
Ford, who had known Smith and Miss Royal for several years, testified that about a week before the murders defendant offered him a "bundle of heroin" to locate and identify Smith and Miss Royal in Alexandria; that on July 19 defendant had learned the witnesses were located in New Orleans and he overheard defendant assure Davis he (Davis) would receive $20,000.00 *1157 for killing Smith and Miss Royal; that the following afternoon defendant instructed him that Davis would pick him up later that day for the purpose of pointing out Smith and Miss Royal; that he refused to accompany Davis, who forced him into the car by pulling a gun and by threatening to report his participation in an earlier armed robbery; that he accompanied Davis and another man to the motel, where Davis murdered both witnesses; and that Davis later saw defendant at a bar and exchanged gestures signifying that the murders had been accomplished.
Limitation of Voir Dire Examination
Defendant first contends the trial court erred in refusing to allow voir dire examination of prospective jurors concerning the district attorney's role as prosecutor and in denying his motion for a new trial when subsequent proceedings demonstrated the district attorney had capitalized on his "special position".
The trial was conducted by the district attorney himself and his then chief assistant, admittedly a rare procedure reserved for the most important cases. Moreover, according to defense counsel, the district attorney took a special interest in this case from the beginning, having visited the scene and having made statements to the media criticizing the trial judge for granting the pretrial interview.
Defense counsel argues that the credibility of Ford as a state witness was the overriding issue in this case and that Ford's credibility had to be destroyed, not merely impeached, because defendant was given a "bad man" image at the outset by motive evidence of the heroin charge against him. Further arguing that the personal involvement of the district attorney (whose grant of immunity could be construed as an indication of his personal belief in Ford's veracity) projected that official's credibility and prestige into Ford's testimony, defense counsel contends that his client was severely prejudiced by the trial court's limitation of voir dire examination.
At the beginning of voir dire examination, when defense counsel named the four members of the prosecution team and noted that he was the only person representing defendant, the trial judge instructed the jury that counsel was not on trial and that the case was not to be judged on the quantity or quality of representation, but upon the evidence presented. Subsequently, the trial court rejected an attempt by defense counsel to inquire into possible bias resulting from the district attorney's involvement in the case.[1]
While conceding he was allowed wide latitude in most relevant areas of the voir dire examination, defense counsel contends that he should have been allowed to test for bias in view of the extent to which the district attorney thrust himself into the case and that his client was prejudiced by the limitation imposed on voir dire examination.
The purpose of voir dire examination is to discover bases for challenges for cause and to secure information for the intelligent exercise of peremptory challenges. State v. Hayes, 364 So.2d 923 (La. 1978). Since La.Const. 1974, Art. 1, § 17 guarantees the right to full voir dire examination *1158 of prospective jurors, parties must be afforded wide latitude in conducting the examination. Nevertheless, C.Cr.P. art. 786 vests the trial court with discretion as to the scope of the examination, and review for abuse of discretion should be undertaken on the record of the examination as a whole. State v. Jackson, 358 So.2d 1263 (La.1978).
Here, defense counsel proceeded unfettered in questioning jurors about their acquaintance with the district attorney and about pretrial publicity, but properly was not allowed to develop the substance of the publicity. Counsel, without objection, also questioned one juror on whether his decision would be influenced by who was counsel in the case. The trial judge, however, limited counsel's inquiry into the district attorney's alleged "special status", but apparently did so simply to prevent the development of a battle of personalities. Moreover, since both counsel hinted that part of the blame for the deaths was on opposing counsel or on the judge in the drug trial, the trial judge reasonably sought to avoid a potentially volatile situation by curtailing questioning in reference to particular attorneys involved in the trial.[2] And the court's admonition about the irrelevance of counsel identify reasonably got the point across that the case was to be decided on the evidence and not on the personalities of the attorneys trying the case.
Other complaints about behavior of the district attorney before and during trial more properly should have been raised by motions for recusal or for change of venue.
The overall record establishes that the trial judge accorded sufficiently wide latitude without allowing the personality of counsel to become an issue and that defendant was not deprived of his constitutional right to a full and effective voir dire examination. The record, furthermore, does not support defense counsel's assertion that the district attorney's explanation in closing argument of his decision to grant immunity constituted capitalization on his "special position".
Disclosure of Exculpatory Evidence
Defendant contends the trial court erred in refusing to order production, at least for cross-examination, of Ford's written statement given to a police officer at the time of his arrest, two days after the murders.
Prior to trial defense counsel requested the production to disclose all exculpatory evidence, including any statement by Ford, and any evidence tending to reduce the credibility of a prosecution witness. The prosecution denied having any statements exculpating defendant and indeed, as defense counsel concedes, the written statement did not give any indication of defendant's innocence and had no exculpatory value prior to trial.
At trial, after completion of Ford's direct testimony, defense counsel filed a motion for disclosure of information for cross-examination, specifically requesting statements inconsistent with Ford's testimony. The prosecution admitted Ford had given a written statement, but denied any inconsistency with his testimony on direct. At defense counsel's request the trial judge examined the statement in camera and ruled that the defense was not entitled to production, commenting that the written statement was not inconsistent with Ford's testimony. The statement was then sealed for purposes of appeal.[3]
On appeal defendant argues that the statement was crucial impeachment evidence, pointing out particularly that the statement made no mention of a promise by defendant to give Ford heroin in exchange for his trip to Alexandria or of Davis' use of a gun to force Ford to accompany him (Davis) to the motel. Defendant further emphasizes the importance of impeachment material in this case, in which the witness' *1159 testimony was the only evidence linking defendant with the actual killers.
The duty of the prosecution to disclose exculpatory material was first imposed in order to deter prosecutorial misconduct which deprived the accused of a fair trial. Thus, a conviction was reversed in Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), when the prosecution intentionally used perjured testimony. Subsequently, in Brady v. Maryland, 373 U.S. 83, 85, 83 S.Ct. 1194, 1195, 10 L.Ed.2d 215 (1963), a case in which the prosecution withheld an extrajudicial statement by Brady's companion in which he admitted he had actually committed the homicide, the court reversed the conviction, holding that the suppression of requested exculpatory evidence violates due process, when the evidence is material to guilt or punishment. Then in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), when the principal witness for the prosecution falsely testified that he had received no promises of consideration, the conviction was reversed, although the trial prosecutor had no actual knowledge that such a promise had been made by the grand jury prosecutor. In determining whether the omitted evidence of the promise was material enough to warrant reversal, the court applied the standard of whether the false testimony "could ... in any reasonable likelihood have affected the judgment of the jury".
The Giglio case thus adopted a relatively low standard of materiality for omitted evidence to constitute grounds for reversal, but the case involved perjured testimony which the prosecution knew or should have known to be false. However, in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), a case which did not involve the deliberate use (or constructively deliberate use) of perjured testimony, the court applied a higher standard of materiality. In the Agurs case defendant had not made a specific pretrial request for favorable evidence, and the prosecution failed to provide certain background information about the victim that arguably bore on defendant's plea of self defense. The court refused to reverse the conviction, holding there was constitutional error only when the evidence suppressed by the prosecution creates a "reasonable doubt that did not otherwise exist".
In State v. Falkins, 356 So.2d 415 (La. 1978), a case involving a request for specific exculpatory evidence, this court used the test of whether the evidence created a reasonable doubt that did not otherwise exist, distinguishing cases "[involving] only matters marginally useful for purposes of impeachment". And in State v. Curtis, 384 So.2d 396 (La.1980), this court used the same standard in a case involving only a general request for any exculpatory evidence.
The applicable standard of materiality depends on the totality of the facts and circumstances in each case. And the prosecutor is faced in each case with deciding whether certain evidence is materially favorable so as to give rise to a duty to disclose. The Agurs opinion suggested a solution to this dilemma, at least when a request for specific evidence has been made, as follows:
"... Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." (Emphasis supplied.)
Use of an in camera examination by the trial court to determine whether a witness' prior statement is inconsistent with his trial testimony so as to entitle the defense to access to the statement was also suggested in the concurring opinion in State v. Babin, *1160 319 So.2d 367 (1975).[4] This procedure provides a method for determining materiality based on an independent judicial decision, rather than on an assertion by a state official charged with the duty of prosecuting. At the same time this procedure deters any prosecutor who would deliberately withhold arguably material evidence in the hope that a reviewing court would hold the evidence immaterial or the suppression harmless. Finally, this procedure, by which the trial court exercises discretion in determining materiality, provides a method of efficient review of that decision by direct appeal and avoids the less efficient post-conviction applications and hearings related to alleged constitutional errors not contained in the record.
In the present case the trial judge commendably conducted an in camera examination and then denied defendant access to the statement for use in cross-examination. The critical issue, therefore, is whether the nature of the evidence was such that refusal of access denied defendant his constitutional rights of confrontation and due process.
Arguably, the lower standard of materiality, applicable in cases in which the prosecution declines a request for specific evidence, should be raised when there is an in camera examination in order to encourage prosecutors to seek a judicial determination of materiality. See Galtieri v. Wainwright, 582 F.2d 348 (5th Cir.1978), in which the court en banc applied the higher standard when the court, not the prosecutor, made the decision that the trial should continue without a transcript of one of the several grand jury proceedings, of which the defendant had previously been unaware.[5]
In the present case the prosecution submitted the requested statement for private inspection. This case, therefore, does not involve prosecutorial misconduct in suppressing favorable evidence, but rather the exercise of judicial discretion in determining whether the evidence is materially favorable.[6] Moreover, the evidence at issue is not clearly exculpatory, nor is it even inconsistent, but merely contains omissions which may be questioned on cross-examination.[7] *1161 And the questionable impact of such noncontradictory omissions is even more questionable in this case, in which Ford was shown to be a heroin addict, a male prostitute who "rolled" clients, an armed robber, and a principal in a murder who had been granted immunity. It is therefore highly doubtful that the jury, which credited Ford's testimony in the light of these revelations, would have discredited him if he had been cross-examined on the omission of facts in his earlier statement.
In direct examination at trial Ford testified precisely in accordance with his answers in the written statement. However, when asked on cross-examination how he got to the motel, Ford answered that he entered Davis' car after Davis pulled a gun on him. He also stated, in answer to a separate question, that he had told police about Davis' use of a gun and that Davis threatened to reveal information about his involvement in an armed robbery if he didn't cooperate. On redirect examination, when Ford was asked if he was offered anything by defendant for going to Alexandria, he stated he was offered a bundle of heroin, a detail not mentioned in the written statement.
The additional facts stated in Ford's in-court testimony were prompted by cross-examination and did not contradict anything in his written statement. While there are some aspects of inconsistency, in that both versions are not precisely identical, the difference may simply be attributed to the investigating officer's failure to ask Ford specifically if he was offered anything to go to Alexandria or if he was threatened with a weapon to go to the motel. The only significant "inconsistency" is Ford's testimony that he told police of the pistol threat, a fact not appearing in the written statement, but Ford may have told this to officers at some point other than when his confession was being recorded, or may simply have been confused. In any event the omitted evidence, when considered in the context of the entire record, does not create a reasonable doubt that did not otherwise exist.
While the standard of materiality to apply in each case must be decided on the particular facts and circumstances of that case, we apply the "reasonable doubt that did not otherwise exist" standard in this case, since (1) the prosecution has responded to a request for specific evidence by submitting the evidence for in camera examination and (2) the evidence is exculpatory in nature only because it is possibly inconsistent with trial testimony and not because, standing alone, it tends to establish innocence. Using this standard, we hold there was no constitutional error in the trial court's denial of defendant's request for production of the statement so as to deny defendant a fair trial. Moreover, while procedural rules authorizing broad discovery of all relevant evidence might arguably be desirable, the Constitution does not demand the scope of disclosure sought to be required by defendant in this case. United States v. Agurs, above.
The conviction and sentence are affirmed.
AFFIRMED.
MARCUS, J., concurs specially.
NOTES
[*] Calogero, J., would grant a rehearing.
[1] The colloquy between the court and defense counsel was as follows:

"Mr. Glass: If Your Honor please, I think I should ask this question. So, I will submit it to the Court before I do since there was objection in the similar area before. Most of the cases in Orleans Parish are not tried by Mr. Connick. And I think the jury, prospective jurors, should know that the fact the District Attorney himself is trying the case is irrelevant. And that the Attorney for the Defense and District Attorney himself.
"The Court: I thought I made it clear. And I will say it one more time. Please do not go into this again before other prospective jurors.
Ladies and gentlemen, Counsel is not on trial for the charge today. You are not to judge this case based on the representation of the State or Defense as to the quality of representation, the quantities of persons at the table, or anything of the like or similar nature. You are to judge the case upon the evidence presented and nothing more.
The Defendant on trial today is Davis Joseph Sylvester. It is not Mr. Glass, Mr. Weseel, or Mr. Connick. So, judge the case upon the evidence presented and nothing more."
[2] The district attorney mentioned that defendant's motion for pretrial examination of Smith was a "death warrant", while defense counsel raised the question of why the witnesses were not under adequate protective measures.
[3] Defense counsel was allowed access to the statement for purposes of application for a new trial.
[4] The opinion also points out that the constitutional right to confront prosecution witnesses, including reasonable opportunity to impeach their credibility, is to be distinguished from the right to pretrial discovery (although constitutional due process prevents the prosecution from withholding favorable evidence, if requested in pretrial discovery). The rights, while different, are nevertheless related as constitutional guarantees to a fair trial.
[5] The application of the higher standard in the Galtieri decision was distinguished by a three-judge panel in Monroe v. Blackburn, 607 F.2d 148 (5th Cir. 1979). In the Monroe case the conviction for armed robbery was based primarily on defendant's fingerprint found on the door handle of the victim's vehicle. At trial the victim could not identify defendant as the robber, but described a noise at the door before he started to get out of the vehicle. However, in a pretrial statement the victim denied anything unusual had happened until the robber asked for money as he got out of the truck. The court, noting the statement was impeachment evidence which could have been used to urge that the victim improved his testimony by the addition of a detail necessary to support the prosecution's theory, held there was "at least a reasonable likelihood that the suppressed evidence could have affected the verdict".
[6] The discretion should be exercised in favor of disclosure to minimize the chance of denial of constitutional rights, whether the court uses the federal test of relevancy to the subject matter of the testimony or an inconsistency by reason of contradiction or substantial omission.
[7] In the question and answer confession, Ford recited that during the previous week defendant asked him to go to Alexandria in a car furnished by defendant to help locate Smith and Miss Royal, because defendant had a contract out on them; that he told defendant he would think about it; that on the morning of the crime defendant asked him if he had seen Davis and told him Davis would be by to pick him up; that Davis arrived later and told him they had located Smith and wanted him to take a ride; that when he refused, Davis told him he was needed to check for police at the motel (Davis apparently intending for Ford to use his acquaintance with Smith to determine if police protection had been afforded the witnesses); and that he went to the motel with Davis and another man. Later in the statement, when asked if he was forced to go to the motel or went of his own free will, Ford answered that Davis, "told me that he had something on me and he would tell the police and he forced me to go and threatened me". Ford later explained, when asked about what Davis held over his head, that Davis knew of his involvement in an armed robbery.