685 So.2d 1048 (1996)
STATE of Louisiana
v.
Albert Earl LAVALAIS, III.
No. 95-KA-0320.
Supreme Court of Louisiana.
November 25, 1996.
Rehearing Denied December 13, 1996.
*1050 Gilda Rae Small, Mansura, R. Neal Walker, Carol A. Kolinchak, New Orleans, for applicant.
Richard P. Ieyoub, Attorney General, Morgan J. Goudeau, III, Opelousas, David Michael Miller, Baton Rouge, Gary C. Tromblay, St. Houma, for defendant.
MARCUS, Justice.[*]
Albert Earl Lavalais, III was indicted for the first degree murder of Sheila Lemoine Smith, in violation of La. R.S. 14:30 A(4). After trial by jury, defendant was found guilty as charged. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant. The trial judge sentenced defendant to death in accordance with the recommendations of the jury.
On appeal, defendant relies on eighteen assignments of error for reversal of his conviction and sentence.[1]

FACTS
On the morning of February 12, 1985, Sheila Lemoine Smith was found murdered on the utility room floor of her home in the Whiteville area, a rural part of northern St. Landry Parish. She was shot five times in the head and once in the chest with a .38 *1051 caliber revolver. The apparent motive was robbery; jewelry belonging to the victim was missing from the home. Soon after the murder, St. Landry Parish sheriff deputies interviewed defendant, who was employed by the victim's husband, George Paul "Joey" Smith, to do farm work and assist in the nursery, located some 30 yards from the residence where the murder occurred. Defendant was not arrested at this time.
Around the time of the homicide, a violent robbery had taken place near the Smith residence. Three individuals, James Washington, Rodney Gillespie and Joseph Jenkins, were arrested for this robbery and pled guilty. Based upon this information, Deputy Robert Venable and Chief Deputy Harry Lemoine (the victim's father) of Avoyelles Parish became interested in a possible connection with the Smith murder. In September, 1985, Lemoine and Venable tape recorded an interview with Washington in which he implicated himself and Gillespie in the murder of Sheila Smith. However, Washington subsequently recanted his confession, and two grand juries failed to indict Washington or Gillespie for the murder of the victim.
In March, 1992, FBI agents learned of a letter allegedly written by Joey Smith to defendant. At the time, Smith was in jail awaiting trial on federal drug charges. The letter threatened to expose defendant to "the death penalty" unless he arranged for the temporary absence of a witness who was to testify against Smith in federal court. FBI testing established that the letter was in Smith's handwriting and bore his fingerprints. As a result of the letter, defendant was called in for questioning.
In interviews with deputies on April 12 and 13, 1992, defendant began detailing his part in the murder. Although asserting a secondary role, he nevertheless admitted that he procured the murder weapon and received $10,000 of a promised $50,000 in exchange for giving Smith an alibi and for disposing of the jewelry and gun.[2] Defendant then agreed to a polygraph exam, which would be videotaped. On April 14, 1992, defendant accompanied the deputies to Baton Rouge, where the polygraph examination was to be conducted. During the pre-examination interview, defendant at first maintained his story. Under further questioning, however, he identified himself as "the trigger man" who was hired by Smith to kill his wife for $50,000, of which $10,000 had been paid. Furthermore, defendant directed the deputies to the spot where he had buried the victim's jewelry. The murder weapon was never recovered.

PRETRIAL ISSUES

Assignment of Error No. I
Defendant contends that the letter that Smith wrote him from prison while awaiting trial on federal drug charges was hearsay and improperly admitted at trial.[3] Defendant argues that the letter was not admissible as a co-conspirator statement under La. Code Evid. art. 801(D)(3)(b), since the conspiracy terminated before the letter was written.
The letter[4] apparently was written to defendant by Smith in an attempt to direct *1052 defendant to keep his brother from testifying against Smith in an unrelated federal drug trial. It stated in pertinent part:
With your help I will most probably be found innocent and will be in a position to help you should you or our mutual friend ever get in trouble.

* * * * * *
This is another ugly fact if you don't help me and if I'm found guilty because of your brother, then I am going to implicate you (you will get the death penalty), and I will implicate our mutual friend if he doesn't help (he will get the death penalty also) and most of all I will implicate your brother as a helper. Your brother will at least get life in prison and maybe if I can be as good a witness as he has been against me th[en] maybe he will get the death penalty also.
The letter goes on to urge defendant to find his brother because "money and your job will do you no good if he shows up in court." The letter concludes by stating, "[p]lease help me, we can all win."
Under La.Code Evid. art. 801(D)(3)(b), a statement is not hearsay if it is made by a declarant while participating in a conspiracy to commit a crime and in furtherance of the object of the conspiracy, provided that a prima facie case of conspiracy has been established. After the state presents a prima facie case of conspiracy, the burden of proof shifts to defendant to present evidence showing his withdrawal from the conspiracy prior to the time the statements were made by his co-conspirators. The conspiracy is presumed to continue unless or until the defendant shows his withdrawal from or termination of the conspiracy. Such affirmative actions include making a clean breast through confession to the authorities as well as notification to the coconspirators of abandonment or withdrawal. State v. Lobato, 603 So.2d 739, 746 (La.1992).
In the instant case, defendant argues the conspiracy was terminated long before Smith's letter was written. He contends that the object of the conspiracy (the murder of Smith's wife) was accomplished in 1985, some seven years before the letter was written in early 1992. Moreover, he asserts that his confession establishes he abandoned any hopes of receiving the remainder of the money Smith owed him for the murder, since he stated he decided to "leave him alone" after he became involved in the drug charges.
Clearly, defendant failed to prove a withdrawal from the conspiracy, since he did not make a clean breast through confession to the authorities until after the letter was written. Moreover, we are not convinced that defendant proved he abandoned any efforts to collect the remainder of the money owed by Smith for the killing. While certain statements in defendant's confession suggest he did not intend to pursue Smith while the drug charges were pending, it is unclear whether defendant gave up any hopes of ever receiving the money. Some statements in Smith's letter suggest it would be in defendant's best interest to have Smith acquitted, both in terms of keeping the murder quiet and collecting any future money.
In any event, we find that even if the letter was admitted erroneously, any such error was harmless in light of the fact that the letter contained no evidence which was not already set forth in defendant's confession to the police. In fact, the letter makes no direct reference to the murder of Sheila Smith. Rather, it simply indicates that if Joey Smith was found guilty on the drug charges, he would implicate defendant, who would get "the death penalty," and that two others (defendant's brother and "our mutual friend") would also get the death penalty. Other than this vague reference, there is nothing in the letter to connect defendant with the murder. Finally, it is noteworthy that defendant himself relied on the letter at the penalty phase in order to support his argument that he was under Smith's domination and control. Based on these facts, we conclude that admission of the letter, even if erroneous, was harmless.
Assignment of Error No. I is without merit.

Assignment of Error No. II
Defendant contends the trial judge erred in not suppressing his confession. He argues *1053 his confession was involuntary, since it was secured by "police trickery, deception and false promises."
The facts developed at the hearing on the motion to suppress indicate that Detective Rene Speyrer of the St. Landry Parish Sheriff's Office received information from Detective Dale Broussard, who intercepted Smith's letter. Broussard put Speyrer in contact with defendant. Defendant informed Speyrer that sometime after the murder, he had disposed of a gun and a milk carton containing jewelry for Smith. At that point, Speyrer asked defendant if he would submit to a polygraph test. Speyrer testified he did not arrest defendant, and viewed him as nothing more than a cooperating witness in the case against Smith. Defendant agreed to accompany Speyrer to Baton Rouge, where the polygraph test was to be performed. Officer Brad Cook conducted the polygraph examination. He informed defendant that he could not be forced to submit to the examination, stating "I want you to remember that just `cause you're here doesn't mean you have to stay here, because you're free to leave anytime you wish." Officer Cook then attached the polygraph machine to defendant and began asking him "pre-interview" questions for background information. Cook again advised defendant he was not under arrest, could leave at any time and also could ask for an attorney and one would be appointed. During the pre-interview, defendant complained that the straps for the polygraph machine were uncomfortable, and Cook offered to remove them. He then asked defendant, "[y]ou don't want the test? Did you take care of Sheila yourself?" Defendant replied that he killed Sheila Smith, and went on to give a full confession.
Before the state may introduce a confession into evidence, it must affirmatively show that the statement was voluntary and not induced by fear, duress, intimidation, menaces, inducements, or promises. La. Code Crim. P. art. 703(D); La. R.S. 15:451; State v. Bourque, 622 So.2d 198 (La.1993). The test for voluntariness requires a review of the totality of the circumstances under which the statement was given; any inducement offered is but one factor in that analysis. State v. Lewis, 539 So.2d 1199 (La.1989). Statements by police to a defendant that he would be better off if he cooperated are not "promises or inducements designed to extract a confession." State v. Petterway, 403 So.2d 1157, 1160 (La.1981); State v. Dison, 396 So.2d 1254 (La.1981).
In the instant case, defendant contends his confession was not voluntary because Cook threatened that if he did not take the polygraph test, he would go to jail. For example, he contends that he asked Cook whether he would be put in jail if he didn't take the test, to which Cook commented, "if you take this and fail this, you're going to jail." Defendant then asked, "[a]nd if I don't take it, I'm still going to jail?" Cook replied, "I don't want you to turn out a liar, okay?"
We do not find that defendant's fear of jail rendered his confession involuntary. Defendant was repeatedly told by Cook that he was free to leave and did not have to take the polygraph exam. The subject of jail was first brought up by defendant, not Cook. Based on defendant's earlier statements to police regarding the guns and jewelry, he should have realized that he could have been arrested as an accessory after the fact. Therefore, we find nothing misleading in Cook's comments on this subject.
Defendant further contends that Cook made impermissible inducements to him to confess by telling him if he were truthful he would be dealt with differently than a defendant who took the polygraph test and was found to be telling a lie. He asserts that Cook told him that if he confessed, he might go to jail, but "probably won't go there for a lifetime which is a long, long time." He also asserts that Cook made promises that he would talk to the judge and do whatever he could to help.
We conclude that although some of Cook's remarks are problematic, when the comments are taken in their entirety, they are not improper. The thrust of Cook's comments were that defendant would have an easier time if he confessed. Rather than being promises or inducements designed to extract a confession, these comments were "more likely musings not much beyond what *1054 this defendant might well have concluded for himself." Petterway, 403 So.2d at 1160. Therefore, we do not find Cook's comments rendered defendant's confession involuntary.
Lastly, defendant argues that any statements made by Cook to him should be considered in light of defendant's limited mental capacity. He contends his mental deficiencies support his claim that his confession was not voluntary.
Initially, we note that defendant's I.Q. was scored at 77, which does not even place him in the borderline mentally retarded range. See Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In any event, this court has held that diminished mental or intellectual capacity does not of itself vitiate the ability to make a knowing and intelligent waiver of constitutional rights and a free and voluntary confession. State v. Brooks, 541 So.2d 801 (La.1989); State v. Lindsey, 404 So.2d 466 (La.1981); State v. Anderson, 379 So.2d 735 (La.1980). The state bears the burden of proving that the mental defect or condition did not preclude the voluntary and knowing giving of a confession. State v. Lewis, 412 So.2d 1353 (La. 1982). In the instant case, based on the testimony of the officers who took the confession, especially that they had spoken with defendant on more than one occasion, and the detailed confession itself, we conclude that the state carried its burden of showing that defendant's condition did not preclude the giving of a voluntary and knowing confession.
In sum, we find that defendant's confession was freely and voluntarily made. The record reflects that defendant voluntarily agreed to take a polygraph examination and talk with police. Defendant was given his Miranda rights and, after being made aware of his rights, continued to talk with Cook. During the interview, defendant was not under arrest nor was he in a coercive custodial atmosphere. Consequently, the trial judge did not err in finding that defendant freely and voluntarily confessed.
Assignment of Error No. II is without merit.

GUILT PHASE ISSUES[5]

Assignment of Error No. V
Defendant contends that the trial judge erred in excluding hearsay testimony at trial that Rodney Gillespie confessed to killing the victim. He argues that the exclusion of this evidence interfered with his constitutional right to present a defense.
At trial, defendant sought to establish that Rodney Gillespie confessed his involvement in the murder to several individuals. Gillespie was unable to be served with a subpoena because he was working offshore. However, defendant sought to call as witnesses Joe Jenkins, Arthur Jones, James Washington and Wilfred Freeman, claiming these witnesses would testify that Gillespie confessed his involvement in the murder. The trial judge denied the reception of any hearsay testimony, ruling that defendant could not "call as witnesses those individuals that have been told by Rodney Gillespie, a person that is not on trial, that he was the one who actually killed Sheila Smith." Nonetheless, the trial judge apparently did not adhere to this ruling, since all the witnesses defendant sought to call, with the exception of Arthur Jones, did testify at trial.
In Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), the United States Supreme Court held that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." In State v. Gremillion, 542 So.2d 1074 (La.1989), we recognized that while hearsay should generally be excluded, if it is reliable and trustworthy and its exclusion would interfere with the defendant's constitutional right to present a defense, it should be admitted. See also State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198, 201 (reversible *1055 error to exclude hearsay evidence suggesting that defendant's roommate killed victim).
In the instant case, we need not decide whether the trial judge's ruling was in error, since the record reveals that most of the evidence "excluded" by the trial judge was in fact testified to by various defense witnesses without objection from the state. For example, James Washington was called as a witness. Although he denied any involvement in the victim's murder, defendant impeached him with previous statements he made to the Avoyelles Parish authorities wherein he implicated himself in, at a minimum, a burglary of the residence. Joe Jenkins testified that Washington told him that he saw Gillespie go into the Smith residence, heard some shots and saw Gillespie running out with a small paper bag. Wilfred Freeman, who knew Washington and Gillespie from jail, testified that Washington told him that Gillespie killed Sheila Smith. According to Freeman, Washington told him he and Gillespie went to the Smith residence "to do some stealing," stealing cars, and riding lawnmowers. Washington told Freeman that Gillespie "didn't have to kill the girl." Freeman went on to testify that Washington told him the victim was laying with her legs open and commented on seeing her genital area. Finally, Freeman testified that Washington told him:
when they got over there he say, she went to hollering, and I think [Gillespie] grabbed her by the hair and pulled her and he say she took off running and she hollered again and he say [Gillespie] shot her. I think [Gillespie] shot her four or five times but I think he say she was hit once in the face, I think, four times I think he say she was hit....
In addition to this testimony, Officers Venable and Lemoine testified about their investigation and statements they took from Washington and Gillespie.
In sum, a review of the record indicates that defendant was able to put on ample evidence connecting Gillespie with the murder. The only witness defendant stated he wanted to call but did not was Arthur Jones. Given the fact that the trial judge was not adhering to his ruling regarding the hearsay testimony, it is unlikely he would have prevented defendant from calling Jones if he had so desired. In any event, it appears that Jones' testimony would have been substantially similar to the testimony of other witnesses who testified on this issue.[6] Therefore, we are unable to conclude that defendant's constitutional right to present a defense was impaired in any way by the trial judge's ruling.
Assignment of Error No. V is without merit.

Assignment of Error No. XVI
Defendant contends there was insufficient evidence to support his conviction for first degree murder.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. To convict defendant of first degree murder, the state needed to prove the killing of a human being when the offender has specific intent to kill and has been offered or has received anything of value for the killing. La. R.S. 14:30 A(4).
In the instant case, the state's case was built on defendant's confession. Defendant told police that Smith had hired him to kill the victim, that he went to the Smith residence and shot the victim in the face and that Smith paid him $10,000 of a promised $50,000 for the job. By contrast, defendant attempted to mount a defense of innocence by presenting evidence that another individual confessed to the crime. The jury, as trier of fact, determined that the state's theory of the case was more credible than defendant's theory. *1056 Therefore, we conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that defendant was guilty of the first degree murder of Sheila Smith.
Assignment of Error No. XVI is without merit

PENALTY PHASE ISSUES

Assignment of Error No. III
Defendant contends that the prosecution violated his due process rights when it disputed at the penalty phase the presence of the mitigating factor that defendant was acting under Smith's "domination and control," but presented evidence of the same at Smith's trial. He argues that at Smith's trial (which began some two years after defendant's trial), the state presented evidence to support the theory that defendant was under the domination and control of Smith.[7]
At defendant's trial, the state refuted the defense's contention that defendant was acting under the domination and control of Smith. The prosecutor argued against the presence of this mitigating factor in his penalty phase opening statement, noting that Cefus Lacart had declined Smith's offer to kill his wife and that defendant "even declined the offer at first, you know, without retaliation or retribution." The prosecutor went on to argue that defendant could have declined the offer because Smith had not threatened him. During penalty phase closing arguments, the prosecutor argued, "[m]itigating circumstances, there are none."
By contrast, in Smith's trial, the thrust of the state's case was that Smith manipulated and coerced defendant into committing the murder. In support, the state presented the testimony of Charlene Coco, the victim's aunt, who testified that Smith boasted about how defendant looked to him as his Parrain, or godfather, and would do anything Smith asked him to do. In addition, during the state's opening statement at Smith's trial, the prosecutor described defendant as a teenager who was manipulated and coerced into committing a homicide by a wealthy and powerful planter from Cottonport, referring to defendant as "nineteen years old, a young black farm worker under the domination and control" of Smith.
In State v. Wingo, 457 So.2d 1159, 1166 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985), the defendant made a similar argument, contending that the prosecutor adopted an inconsistent view of the evidence in the trial of his codefendant. This court rejected this argument, stating:
This case does not present a situation in which the prosecutor has adopted such a fundamentally inconsistent position in the separate trials of two co-perpetrators that basic fairness might require the trial court to permit the exposure of the inconsistent positions. Here, there was simply a question of the prosecutor's emphasis on the facts relating to culpability of the particular defendant on trial. Each defendant had attempted to shift culpability to the other, and the prosecutor in each case simply pointed out to the jury the evidence reflecting on the culpability of the defendant on trial and the reasonable inferences drawn from the evidence.
We think the present case presents an analogous situation. Although the state's positions in defendant's trial and Smith's trial may appear inconsistent at first glance, this appearance results from the fact that the state's emphasis as to culpability was different in the two trials. In Smith's trial, the thrust of the state's case was to show Smith's culpability for the murderi.e., even though he did not pull the trigger, he was able to use defendant as the instrumentality for the murder. By contrast, in defendant's trial, the state argued that Smith's control over defendant did not rise to the level of a mitigating factor, since Smith's control was not so pervasive that defendant could not have declined the offer without fear of retribution. Therefore, we conclude that any inconsistencies in *1057 the state's position in the two trials does not rise to the level of fundamental unfairness.[8]
Assignment of Error No. III is without merit.

Assignment of Error No. VI
Defendant contends he was prejudiced by the state's introduction of evidence that one of the defense witnesses had received a medical discharge from a life sentence. He argues this evidence prejudiced the jury as to the meaning of a life sentence.
At the guilt phase, defendant called Wilfred Freeman as a witness. Freeman stated he was "very frightened" about testifying because he had a heart condition. He testified about a conversation between him and the district attorney, in which he told the district attorney, "I'm dying from my heart transplant and I'm going to ask you to help me get out [of jail]." According to Freeman, the district attorney told him "have your doctor send me a paper." During the state's cross-examination of Freeman, the following colloquy occurred:
Q: All right, well, let me ask you something. I prosecuted you for second degree murder, huh?
A: Yes, sir.
Q: You're serving a life term, huh?
A: Yes, sir.
Q: And I found out a couple of years ago that you had gotten some doctor to let you out of a life sentence at Angola.
A: Yes, sir.
Q: And you were back here in this community and I found out from the victim that you were having a welcome home party.
A: No sir, it was with my family at a birthday.
Q: But I had you back in Angola, didn't I?
A: Sure, you said you wish I'd die over there.
Q: Life, life means you stay until you die, I thought. I didn't know some doctor could let you go.
Defendant immediately objected, and the trial judge sustained the objection. Defendant moved for a mistrial, on the ground that the "jury is infected by thinking life doesn't mean life." The trial judge denied the motion for mistrial, but admonished the jury "to overlook both the questions and statements made by [the prosecutor] in connection with what he may or may not have done or what may or may not have been done."
We have held that the conditions under which a person sentenced to life imprisonment without benefit of probation, parole or suspension of sentence can be released in the future are not a proper consideration for a capital sentencing jury and should not be discussed in the jury's presence. State v. Lindsey, 404 So.2d 466 (La. 1981), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983). However, not all discussions of pardons mandate reversal. For example, in State v. Glass, 455 So.2d 659 (La.1984), we held that the state's cross examination of a defense expert witness on corrections did not interject an arbitrary factor into the proceedings, since the defense had opened the door to the subject.
In the instant case, although we feel the prosecutor's comments were improper, we do not believe they rise to the level of introducing an arbitrary factor in the sentencing procedure. First, we note these comments were introduced during the guilt phase, not the penalty phase, distinguishing this case from cases such as Lindsey and State v. Sonnier, 379 So.2d 1336 (La.1979), where the offending comments were made during the penalty phase. Defendant promptly objected to the comments, and the trial judge admonished the jurors to overlook the prosecutor's statements and questions. Unlike the comments in Lindsey and Sonnier, the comments *1058 in the instant case were not directed at defendant, but rather at an unrelated witness who had been convicted of second degree (as opposed to first degree) murder. Moreover, we find that as in Glass, defendant himself may have opened the door to this line of inquiry by asking the witness about his medical condition and his conversations with the district attorney regarding his condition. Likewise, during the penalty phase, defendant put on the testimony of Dora Rabalais, the Director of Legal Programs for the Louisiana State Penitentiary. Ms. Rabalais testified regarding commutations, indicating it was a "rare occasion" for an inmate to be released from a life sentence. On cross-examination, Ms. Rabalais was specifically asked about Wilfred Freeman. Although she was not familiar with his case, she stated on re-direct that medical discharges were usually "reserved for people who are terminally ill." Based on all these factors, we are unable to conclude that the prosecutor's brief comments in the guilt phase introduced an arbitrary factor into the penalty phase.[9]
Assignment of Error No. VI is without merit.

SENTENCE REVIEW
Article 1, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.Code Crim. P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(a) PASSION, PREJUDICE OR ANY OTHER ARBITRARY FACTORS
Defendant contends that arbitrary factors were introduced into the proceedings by introduction of evidence that one of the defense witnesses had received a medical discharge from a life sentence. We have considered this argument in our discussion of Assignment of Error No. VI and found it to be without merit. There is no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death sentence.

(b) STATUTORY AGGRAVATING CIRCUMSTANCES
The jury in its verdict found the following aggravating circumstances:
(a) the offender offered or has been offered or has given or received anything of value for the commission of the offense. (La.Code Crim. P. art. 905.4(A)(5)).
(b) the offense was committed in an especially heinous, atrocious or cruel manner (La.Code Crim. P. art. 905.4(A)(7));
The evidence amply supports the conclusion that defendant was offered or received something of value for the killing, since his confession established that he received $10,000 of a promised $50,000 from Smith for killing the victim.
Since we find this aggravating circumstance is clearly supported by the record, we find it unnecessary to address whether the jury erred in finding the offense was committed in an especially heinous, atrocious or cruel manner. The failure of one aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. *1059 State v. Martin, 93-0258 (La.10/17/94), 645 So.2d 190, 201. Since the evidence supporting the other aggravating circumstance was part of the facts surrounding the murder, it is clear that admission of this evidence did not interject an arbitrary factor into the proceedings.

(c) PROPORTIONALITY TO THE PENALTY IMPOSED IN SIMILAR CASES
Federal constitutional law does not require a proportion ality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La. Sup.Ct. R. 28, § 4(b) provides that the district attorney shall file with this court a list of each first degree murder case tried after January 1, 1976 in the district in which sentence was imposed. The state's list reveals that eight first degree murder cases were tried in the Twenty-Seventh Judicial District, consisting of St. Landry Parish, since January 1, 1976. Our research reveals that jurors in the Twenty-Seventh Judicial District have recommended the death penalty in two cases since January 1, 1976.[10]
Given the scarcity of comparable cases in St. Landry Parish, it is appropriate to look beyond the judicial district in which sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1030-1031.
Throughout the state since 1976, there have been relatively few murder for hire convictions in comparison to other first degree murder convictions. In most cases arising under La. R.S. 14:30(A)(4), a life sentence has been recommended.[11] However, in State v. Smith, 600 So.2d 1319 (La.1992), a death sentence was imposed in a murder for hire case.[12] In Smith, the co-defendant, Anthony Scire, paid Smith to construct an explosive device and affix it to the victim's pick-up truck. The victim was targeted because he had testified against several individuals on charges of conspiracy to distribute cocaine in Florida.
Although we recognize that the death penalty has been infrequently applied in cases involving murder for hire, we do not find this fact alone is dispositive on the issue of proportionality. As we stated, there have been relatively few murder for hire cases in Louisiana. If we were to hold, based on the small sampling of cases that we have, that the imposition of death is disproportionate simply because other juries recommended life in the preceding cases, we would forever preclude the possibility of imposing a death sentence in a murder for hire case.
Defendant further suggests that the sentence in his case is disproportionate when compared to the sentence of life imprisonment that Joey Smith received when he was subsequently tried for first degree murder.[13] *1060 However, the fact that a co-defendant has received a more lenient sentence does not necessarily indicate that the penalty imposed on the defendant is excessive. State v. Day, 414 So.2d 349 (La.1982). Individualizing a sentence can not be done without independently considering the merits of each case. State v. Rogers, 405 So.2d 829 (La.1981).
Considering the independent merits of each case, we do not find it is inconsistent for one jury to impose death in the case of the person actually committing the murder and for another jury to impose a life sentence in the case of the person who ordered the murder, but did not actually commit it. While Smith is responsible for setting events in motion, the fact remains that defendant actually pulled the trigger and committed the murder. Therefore, we do not find the mere fact that Smith received a life sentence makes defendant's death sentence disproportionate.
The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate that defendant is a black male born on July 28, 1965. He was approximately 19 years old at the time of the offense. Defendant was married on June 22, 1985 and has fathered three children, ages six, four and two. Before his arrest, he was residing with his wife and three children.
Defendant is the oldest of nine children. His parents were divorced around the time of the offense. Defendant was born in Pineville and grew up in Cottonport, Louisiana, where he resided until age 20 when he moved to Dallas, Texas. In school, defendant completed the fifth grade before quitting altogether at age 16. He then enrolled at the Cottonport Vo-Tech School in a mechanics class which he completed. Defendant has a borderline level of intelligence placing him below 94 percent of the general population in mental capacity. Defendant admits to occasional beer consumption and regular use of marijuana; however, there is no indication that alcohol or drugs were involved in the instant offense.
The reports also reflect that defendant has been gainfully employed since 1982 and his jobs have included bricklayer helper, farm laborer, security guard, truck driver, employee at Taco Bell, employee at Rick's Glass Detail Co. and marble setter helper. Defendant also indicates that he was employed between 1982 and 1985 by Joey Smith, as a farm laborer and has worked for Smith on a part-time basis since age 11. The reports further indicate that defendant has no juvenile or adult criminal history.
After having considered the above factors, we are unable to conclude that the sentence of death in the instant case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Hence, based on the above criteria, we do not consider that defendant's sentence of death constitutes cruel, excessive, or unusual punishment.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La. R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for applying for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
CALOGERO, C.J., and JOHNSON, J., dissent and assign reasons.
CALOGERO, Chief Judge, dissenting.
At the time of the murder, defendant Lavalais was a nineteen-year-old poor farmhand with a marginal IQ. He and his family were part of a "plantation culture," living and working in Smith's fields. Since the age of *1061 eleven, defendant was a farm laborer for Smith, used to executing his directions.
Under La.C.Cr.P. art. 905.9 and La. S.Ct.R. 28, § 1(c), this Court reviews every death sentence to determine if it is constitutionally excessive because the sentence is disproportionate, considering the offense and the offender.
The death penalty imposed on Lavalais appears disproportionate in light of the failure of other juries around the state to return death penalties in murder-for-hire cases. Only once before since 1976 has a Louisiana jury sentenced the triggerman to death in a murder-for-hire case, and this was overturned. State v. Smith, 600 So.2d 1319 (La. 1992).
The only murder-for-hire case in St. Landry Parish other than this one involved this same murder. In that case, Joey Smith recruited this defendant to kill Smith's wife. For his part in ordering the murder, Smith was given a life sentence.
The thrust of the state's argument against Smith was that although Smith did not pull the trigger, he used Lavalais as the instrumentality of the murder. Smith, descended form a wealthy plantation family, had been giving orders to the defendant since Lavalais was his eleven-year-old farm laborer. Even though the state argued that Lavalais was under the dominion and control of Smith in the Smith trial, the prosecutor disputed the presence of this mitigating factor in its present case against the defendant Lavalais.
The two different approaches in prosecuting the defendant and Smith would not alone necessarily render defendant's sentence unfair. See Lassiter v. Department of Social Services, 452 U.S. 18, 25, 101 S.Ct. 2153, 2161, 68 L.Ed.2d 640 (1981). However, there is a question as to prosecution's failure to use the testimony of Witness Coco, who testified in Smith's trial that defendant looked to Smith as his "Parrin," or godfather, and would do anything Smith asked him to do. Clearly such testimony would have been helpful to the jury in the penalty phase.
Defendant's limited experience and resources, combined with an IQ of 77, places his mental capacity 94% below that of the general population. His dependant personality further made him particularly susceptible to manipulation and coercion. From the ages of eleven until the time of the offense when defendant was nineteen, the defendant was in the employ of Smith. In the seven years between the time of the offense and the arrest, Lavalais was gainfully employed.
In light of the above, I dissent from the majority's affirmance of the death penalty. The death penalty is disproportionately excessive considering the offense and offender. The majority has only recognized one case in which a death sentence was imposed under similar circumstances. In State v. Smith, 600 So.2d 1319 (La.1992), the Louisiana State Supreme Court reversed the conviction of a paid hit man, who murdered the victim in retaliation for damaging testimony. Here, the defendant was an inexperienced, nineteen-year-old farmhand, who had depended on Smith's benevolence throughout his formative years. For his part in directing that Lavalais murder Smith's wife, Smith received a life sentence. If disproportionality has a legitimate place in the law (and it does: See Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)), it is for application in cases such as this. For Lavalais's part in the offense, I would affirm the conviction and have the defendant sentenced to life in prison at hard labor.
Accordingly, I respectfully dissent.
JOHNSON, Judge, dissenting.
The transcript of the trial reads more like fiction than an American tragedy which left a woman murdered for hire, the shooter on death row, and the man who solicited and paid for the murder convicted, but sentenced to life in prison rather than facing the death penalty.
Lavalier was a 19 year old farm hand working on the Smith family farm in Cottonport, Louisiana, when George Paul "Joey" Smith talked him into killing his wife, Sheila Smith, for $50,000. (He actually paid $10,000 to Lavalier). Smith collected $500,000 in insurance proceeds and the authorities, although suspicious, never were able to make a case against him.
*1062 "Plantation" would be a more accurate word than "farm" to describe the vast land holdings owned by the Smith family in St. Landry Parish because included in the definition of land mass is a historical relationship between black farm workers and property owners. At Smith's trial, the prosecutor argued that Smith was descended from a "plantation family that farms thousands of acres of farm land, cattle, rice, cotton, beans, and corn", and that defendant's family was part of this "plantation culture" in that family members lived and worked in the fields. The prosecutor acknowledged that Lavalais family members worked for Smith before and after the murder, and there was a very close relationship between Smith and Albert Lavalais and the Lavalais family.
As can be expected with any "plantation culture", after living on the land for several generations, individuals become economically dependent, and can easily be intimidated into carrying out the wishes of landowners, even when doing so is not in their own best interest. Such individuals become bound by emotional ties which are not easily untangled. Because of these circumstances underlying Lavalais' actions and the nature of his relationship to Smith, Lavalais was under the domination and control of Smith, and such fact should have been a mitigating factor during the sentencing phase of Lavalais' trial.
Even the state acknowledged at Smith's trial the fact that Lavalais was under Smith's dominion and control. During Smith's trial, the state presented the testimony of Charlene Coco, the victim's aunt, who testified that Smith boasted about how Lavalais looked up to him as his "Parrain", a term used throughout Acadiana that translates to "godfather." Coco testified to the following conversation:
And [Smith] ... put his arm around Albert's shoulder and said, "isn't that right? You think of me as your Parrain." And, "You would do anything I would ask you to do, wouldn't you, Albert?" And Albert looked at him and he repeated it, he said, "You look at me as your Parrain and if I asked you to do anything you would do it for me." And Albert answered, "Yes, I would."
In addition, during the state's opening argument at Smith's trial, the prosecutor described defendant as a teenager who was manipulated and coerced into committing a homicide by a wealthy and powerful planter from Cottonport. The prosecutor further argued that Smith was a "manipulative, a cunning, a scheming and a p[lan]ing individual."
What is more interesting is that while the state put on the above stated evidence in Smith's trial in 1995, at Lavalais' trial in 1993, the state refuted Lavalais' contention that he was acting under the domination and control of Smith. The state expressly argued against the presence of this mitigating factor in its penalty phase opening statement.
Under these facts and circumstances, imposition of the death penalty is excessive and disproportionate. A comparative review of "murder for hire" cases reveal that throughout the state of Louisiana since 1976, there have been relatively few murder for hire situations. With the exception of one case prosecuted under La. R.S. 14:30(A)(4), a life sentence has been recommended.[1]State v. Smith, 600 So.2d 1319 (La.1992) remains the only case in which a death sentence was imposed for conviction under La. R.S. 14:30(A)(4). In State v. Smith, defendant Scire had procured and paid Smith for the killing of the victim who had testified against several individuals on charges of conspiracy to distribute cocaine in Florida. To execute the killing, Smith constructed an explosive device, affixed it to the victim's pick-up truck, and was paid for doing so. Id. Although defendants were initially sentenced to death, this court overturned their convictions and *1063 sentences and remanded for a new trial based on an erroneous reasonable doubt instruction. State v. Smith at 1327-28. On remand, Smith was acquitted by a jury on retrial and the State allowed Scire to plead to manslaughter.
In light of Louisiana's jurisprudence, it is evident that Louisiana juries have been inclined to recommend sentences of life imprisonment in murder for hire cases. It is also evident that juries make no distinction in moral culpability between the trigger man and the person who recruits him for the murder. Yet, in the present case, Lavalais, who is a young, Black man who was 19 years of age at the time of the crime, received the death penalty while Smith, who is White, was sentenced to life imprisonment. In juxtaposition, these cases offer striking examples of age-old stereotypes and prejudices that state and federal jurisprudence has tried to rectify in capital cases. Unfortunately, such objectives and goals were not met in this case.
For the foregoing reasons, I respectfully dissent.
NOTES
[*] Kimball, J. (recused) not on panel. Rule IV, Part 2, § 3.
[1] The assignments of error not discussed in this opinion do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[2] According to the transcripts of the April 12 and 13, 1992 interviews, a few weeks before the murder, defendant procured for Smith a .38 caliber revolver and a 9mm semi-automatic handgun. For this, he was paid $1,000 per weapon plus costs. Procurement of the weapons came against the backdrop of statements by Smith that his wife was running around on him; that he was "getting tired of her," that he "wanted to [have her] killed for the [$500,000] insurance," and that he would pay $50,000 "to have her killed." On the morning of the murder, defendant was at work in the nursery when Smith came in and handed him the .38 and a milk carton, which Smith said contained jewelry. Smith told defendant to "throw it all away...." Defendant, lastly, admitted that Smith promised him $50,000 to dispose of the items and to furnish him with an alibi. Smith had paid defendant $10,000, with a promise of the remainder within five years. While no more money was paid, defendant made no demands on Smith, knowing of his various "trouble[s,]" including being the focus of a federal drug investigation.
[3] The trial judge granted defendant's motion in limine and excluded the letter. However, upon the state's application for supervisory writs, the court of appeal reversed and vacated the trial court's ruling.
[4] It should be noted that the "letter" is actually two separate letters which appear to have been written on two separate dates; however, they were both contained in the same envelope and state basically the same things.
[5] Only those guilt phase errors in which a contemporaneous objection was raised will be addressed on appeal. See State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158; State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364. Accordingly, Assignments of Error Nos. VII and VIII will not be addressed.
[6] In his brief, defendant indicates that Jones had also been in prison with Gillespie. Gillespie supposedly told Jones about the killing, that he had "killed the bitch" and was not worried. Gillespie also allegedly stated that "the murder weapon was thrown into a bayou or river, or something, in the Mansura area."
[7] Defendant filed a motion to supplement the record on appeal with transcripts from Smith's trial. The motion was denied by this court; however, the court allowed defendant to file certified copies of the transcript from Smith's trial as exhibits to his brief.
[8] Defendant also raises the issue of whether the prosecutor failed to disclose potentially exculpatory evidence, such as the testimony of Charlene Coco. Since Ms. Coco's testimony was presented by the state at Smith's trial, which took place approximately two years after defendant's trial, it is impossible for us to determine on the record before us whether the state knew of the existence of this witness at the time of defendant's trial. Accordingly, we decline to pass on this issue at this time. However, we reserve defendant's right to file an application for post conviction relief on this issue.
[9] Defendant also objects to the prosecutor's comment in the closing argument at the penalty phase, in which the prosecutor stated, "I spend about one fourth of my time objecting to the board of parole and pardons on the release of life imprisonment prisoners." Again, we find this statement improper; however, we are unable to conclude that this brief comment introduced an arbitrary factor into the sentencing proceeding.
[10] Both sentences have been vacated. In State v. Carmouche, 508 So.2d 792 (La. 1987), this court affirmed the conviction and sentence on original hearing. However, on rehearing, we reversed the conviction and sentence and remanded for a new trial, finding defendant was denied effective assistance of counsel because of a conflict of interest. Defendant then pled guilty to first degree murder and received a life sentence. In State v. Bates, 495 So.2d 1262 (La. 1986), we affirmed the conviction and sentence. Defendant filed a post-conviction relief application alleging a conflict of interest between defense counsel and the district attorney. The application was granted and a hearing held at which time an agreement was reached by all attorneys of record. The sentence of death was set aside and defendant was resentenced to life imprisonment. See State ex rel. Bates v. Pavy, 481 So.2d 1326 (La.1986).
[11] See State v. Jones, 607 So.2d 828 (La.App. 1st Cir. 1992), writ denied, 612 So.2d 79 (La. 1993); State v. Velez, 588 So.2d 116 (La.App. 3d Cir. 1991), writ denied, 592 So.2d 408 (La.1992); State v. Fleming, 574 So.2d 486 (La.App. 4th Cir. 1991); State v. Seward, 509 So.2d 413 (La. 1987); State v. Woodcock, No. 275-167 "I", as reported in State v. Koll, 463 So.2d 774 (La.App. 4th Cir.), writ denied, 467 So.2d 1131 (La.1985); State v. Ester, 458 So.2d 1357 (La.App. 2d Cir. 1984), writ denied, 464 So.2d 313 (La.1985); State v. Johnson, 438 So.2d 1091 (La.1983); State v. Whitt, 404 So.2d 254 (La.1981); State v. Sylvester, 388 So.2d 1155 (La. 1980).
[12] This court reversed defendants' convictions and sentences on the ground an erroneous reasonable doubt instruction was used. On remand, Smith was acquitted by a jury on retrial and the state allowed Scire to plead to manslaughter.
[13] In connection with this argument, defendant filed a motion to remand the case for an evidentiary hearing, based on an affidavit from one of the jurors in his case, stating the juror would not have voted for the death penalty if he had known Smith would receive a life sentence. We decline to rule on this motion at the present time, finding it is more properly raised on application for postconviction relief.
[1] See State v. Jones, 607 So.2d 828 (La.App. 1st Cir. 1992); writ denied, 612 So.2d 79 (La. 1993); State v. Velez, 588 So.2d 116 (La.App. 3rd Cir. 1991), writ denied, 592 So.2d 408 (La.1992); State v. Fleming, 574 So.2d 486 (La.App. 4th Cir.1991); State v. Seward, 509 So.2d 413 (La. 1987); State v. Woodcock, No. 275-167 "I", as reported in State v. Koll, 463 So.2d 774 (La.App. 4th Cir.1985), writ denied, 467 So.2d 1131 (La. 1985); State v. Ester, 458 So.2d 1357 (La.App. 2nd Cir. 1984), writ denied, 464 So.2d 313 (La. 1985); State v. Johnson, 438 So.2d 1091 (La. 1983); State v. Whitt, 404 So.2d 254 (La.1981); State v. Sylvester, 388 So.2d 1155 (La.1980).