707 So.2d 990 (1997)
STATE of Louisiana, Appellee,
v.
Antonio JACKSON, Appellant.
No. 29470-KA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 1997.
*993 John F. Brewer, Jr. and Richard Goorley, Shreveport, for Appellant.
Richard Ieyoub, Attorney General, Paul Carmouche, District Attorney, Hugo A. Holland, Assistant District Attorney, for Appellee.
Before HIGHTOWER, BROWN and STEWART, JJ.
HIGHTOWER, Judge.
Addressing two counts of first degree murder, La. R.S. 14:30, a jury found Antonio Jackson guilty of one count of second degree murder, La. R.S. 14:30.1, and one count of manslaughter, La. R.S. 14:31. The court ordered that, for these respective offenses, Jackson serve consecutive life-without-benefit and forty-year terms of imprisonment at hard labor. Defendant now appeals the convictions and sentences. We affirm.

FACTS
On June 9, 1994, Randall Glenn Thomas, Joseph Jackson, and defendant planned the armed robbery of Burford's Grocery Store in Keithville, Louisiana.[1] The following morning, the trio placed scarves over their lower faces, armed themselves, and went into the front part of the establishment demanding money from David and Glenn Lacobee, the father and son proprietors. Glenn's mother and David's wife, Helen Lacobee, quickly moved into the store's office. When Thomas attempted to force him to hand over the money from the cash register, David Lacobee drew his own pistol and the pair exchanged fire, injuring Thomas and fatally wounding the elder victim.[2] Thomas then ran from the store and drove away in the robbers' vehicle. One of the Jacksons next shot and killed Glenn Lacobee kneeling by the safe in the rear of the store, despite his compliance with the malefactors' demands. Joseph Jackson then removed approximately $400 in change from the safe.
After fleeing the store, the Jacksons ran through some nearby woods to a highway. They then caught a ride to Shreveport, before taking a bus home. Some ten days later, an anonymous caller led investigators from the Caddo Parish Sheriff's Office ("CPSO") to the Jacksons. After officers visited the residence of Martha Jackson (Joseph's sister and defendant's mother), the three men agreed to go to CPSO to discuss the case.
They soon each confessed to participating in the robbery. Thomas also admitted shooting David Lacobee, but both of the Jacksons denied shooting Glenn Lacobee. Even so, investigators identified Antonio Jackson's palm prints on a meat counter in the back of the store near Glenn Lacobee's body. Charged with two counts of first degree murder, *994 Antonio Jackson proceeded to trial in early 1996.

DISCUSSION

ASSIGNMENT OF ERROR NO. 1
In this first assignment of error, defendant complains that the trial court failed to suppress his inculpatory statement and two photographic identifications.

Inculpatory Statement
Defendant contends that police conduct in obtaining his inculpatory statement violated the Fourth Amendment. In State v. Thomas, supra, however, we exhaustively considered and rejected the identical argument. Defendant gave his statement under essentially the same circumstances as Thomas, and later joined him in the same motion to suppress. With defendant failing to raise any new issue or show further circumstances peculiar to his treatment, we find Thomas dispositive regarding the admissibility of the statement presently before us. This aspect of the assignment is without merit.

Photographic Identifications
Next, defendant curiously urges the suppression of two photographic identifications never introduced at trial. All the same, the trial court denied a motion to suppress that failed to specify any particular identifications.
On appeal, defendant designates the two alleged identifications as coming from Lisa Boyd and Hulon Carkeet, the first of these individuals being near the store on the morning in question and the other having driven the bus the Jacksons rode after the incident. The record, however, does not reveal Boyd's participation in a photographic lineup. Furthermore, at trial, she never pointed out the defendant or mentioned a line-up, nor did any witness testify regarding her alleged identification. Notably too, the denial of the motion to suppress addressed only Carkeet's identification of the Jacksons in two photo line-ups conducted after the police received their inculpatory statements. Still, Carkeet did not testify at trial, nor did any witness refer to his identification. These facts, then, fail to disclose any prejudice to defendant. See La.C.Cr.P. art. 921. Accordingly, this portion of the assignment of error is also without merit.

ASSIGNMENT OF ERROR NO. 2
This assignment asserts that the trial court wrongly found defendant competent to stand trial despite psychological evaluations and tests showing him both without the capacity to assist counsel and characterized as mentally retarded.
In accordance with La.C.Cr.P. art. 641 et seq., the defense filed a Motion for Appointment of a Sanity Commission. Later, after defendant's examination by the appointed commission and a hearing directed at competency, the court found Jackson able to proceed to trial.[3]
Three persons testified at the sanity hearing. For "a little over an hour" in early 1996, Dr. George Seiden, forensic psychiatrist, examined the accused and found him competent to stand trial. He explored defendant's grasp concerning first degree murder, the possible penalties for murder and armed robbery, the concepts of guilt and innocence, the roles of the jury and both attorneys in determining guilt, the judge's role in sentencing, and the possibility of a plea bargain. While not understanding the significance of the sanity commission until provided an explanation, defendant said if he testified he would tell the jury that "he was in the wrong place at the wrong time." Although reluctant to discuss the facts at first, he later related to the doctor about being in the store with "those men," hearing shots fired, not understanding the events, falling to the floor and hiding, and then leaving the store.
While generally able to respond to Dr. Seiden's questions, defendant had some difficulty interpreting proverbs such as "a bird in the hand is worth two in the bush." This inability, attributed to a lower-than-average intelligence, did not indicate to the psychiatrist *995 that Jackson would be unable to understand questions put to him.
To arrive at his opinion, Dr. Seiden relied upon both interviews and psychological testing. Although not disagreeing with the unfavorable test results, he found these indeterminate of defendant's competence to stand trial. Dr. Seiden explained that subnormal intelligence alone does not necessarily equate to such incompetency, and, also, that defendant's psychological test results reflect his possible "malingering," or deliberate attempts to appear less intelligent.
Dr. Dean Robinson, psychiatrist, interviewed the defendant for approximately twenty minutes and found his answers to be internally consistent, i.e., he did not contradict himself at any point and had no problem understanding straightforward questions. This expert essentially agreed with the conclusions of Dr. Seiden. In Dr. Robinson's view, psychological testing is a valuable adjunct to interviews and, if the two results differ, collaboration with psychologists may sometimes be necessary.
After cumulatively spending about eight hours in some six meetings with defendant, Dr. Michael Johnson, a psychologist licensed in 1994, found Jackson incompetent to stand trial due to intellectual deficits. Dr. Johnson gauged defendant's IQ on the Wechsler scale to be 64 or 65, and two other tests contravened certain suggestions of malingering. This expert acknowledged, however, that some of Jackson's poor responses to open-ended questions, like "What are your legal rights?" or "What is a verdict?," could have been the result of "stonewalling" rather than low intelligence.
Dr. Johnson based his conclusion largely upon two psychological tests, viz., the Georgia Court Competency Test and the Court Competency Incomplete Sentences Blank. A "passing" or competent score on the Georgia test is 70, scores between 60 and 70 are marginal, and those below 60 are failing. Defendant scored 54. Compared to a passing mark of 20 on the incomplete sentence test, defendant scored 17. The psychologist felt that objective test results provide more accurate predictors of mental abilities than do interview-based opinions. In a letter reporting his evaluation, Dr. Johnson noted defendant's difficulty in remembering details of the crime, his lack of understanding about the consequences of a guilty plea, and his inability to state his height, weight, date of arrest, or the present date. In regard to the possibility of malingering, the written summary also acknowledged that "[h]is scores may reflect exaggeration of or deliberate feigning of intellectual limits."
It is fundamental, of course, that a defendant who lacks the capacity to understand the proceedings against him or to assist counsel in preparing a defense may not be subjected to trial. La.C.Cr.P. art. 641; Godinez v. Moran, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); State v. Brooks, 541 So.2d 801 (La.1989); State v. Lott, 27,849 (La.App.2d Cir. 04/03/96), 671 So.2d 1182. Mental retardation or subnormal intelligence, however, is not in itself proof of incapacity. State v. Lawrence, 368 So.2d 699 (La.1979). For a discussion of the appropriate considerations in determining competency, see State v. Bennett, 345 So.2d 1129 (La.1977). Because Louisiana law presumes sanity, the defendant faces the burden of establishing his incapacity. State v. Brooks, supra; State v. Bennett, supra; State v. Lott, supra. Furthermore, the determination of competency is ultimately the trial court's responsibility. Id. Thus, the district judge's evaluation of the defendant's mental capacity is entitled to great weight and will be reversed only if clearly erroneous. Id.
The evidence adduced at the competency hearing sub judice shows that, although intellectually limited in some respects, defendant possessed an understanding of the proceedings and could assist in his defense. See La.C.Cr.P. art. 641. His intellectual limitations alone, as previously stated, are insufficient to establish incompetency. See State v. Bennett, supra. Although the expert who believed him incompetent spent considerably more time with him, that comparison affords only one factor in deciding credibility, a determination properly within the trial judge's domain. *996 See State v. Perry, 502 So.2d 543 (La. 1986), cert. denied 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). By additional contrast, the two psychiatrists reporting defendant competent to stand trial possessed greater experience and more substantial professional credentials.
Furthermore, although accepted in the practice of psychology, the two tests heavily relied upon by Dr. Johnson have not been shown to survey those elements important under Louisiana law. While undoubtedly measuring competency under some standard, "failing" grades cannot be substituted for the role of the fact-finder. Cf. State v. Bennett, supra, at 1137-1138. Indeed, several responses termed "failing" by the psychologist seemed to reflect only an unsophisticated view of the judicial process, rather than an incapacity to understand the trial or assist counsel.
Dr. Seiden's testimony directly addressed the Bennett factors. This included defendant's understanding of the charges against him, his legal rights, the consequences of guilt or innocence, and the possible penalties in the event of conviction. Dr. Seiden also considered this accused's ability to understand and respond to questions; elicited his appreciation of the roles of the judge, jury, and both attorneys; and explored his memory regarding what transpired when he entered the store. Thus, in light of the expert testimony presented, together with the experience and qualifications of the witnesses, we certainly cannot find the trial court's determination of competency to be manifestly erroneous. This assignment of error lacks merit.

ASSIGNMENTS OF ERROR NOS. 3, 4, 5 AND 6
These four assignments of error complain that, despite defendant's objections pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the state exercised peremptory challenges excusing three black prospective jurors, viz., Deborah Williams, Shernika Nedd, and Norma Jean Williams.[4]
The Batson holding is codified in our law as La.C.Cr.P. art. 795(C), providing that no peremptory challenge shall be based solely on the race of the prospective juror. To make a Batson contention against the state, the defendant must first establish a prima facie case that the prosecutor used peremptory challenges to exclude members of the venire solely on the basis of their cognizable race. Batson, supra; State v. Green, 94-0887 (La.05/22/95) 655 So.2d 272. Once that showing transpires, the burden shifts to the state to come forward with a race-neutral explanation. This second step of the process does not demand an explanation that is persuasive, or even plausible. And, unless a discriminatory intent is inherent within that explanation, the reason offered will be deemed race-neutral. The persuasiveness of the justification becomes relevant only at the third and final step, when the trial court must decide whether the defendant has proved purposeful discrimination. Clearly, the ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the strike. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); Batson, supra; State v. Green, supra.
The prosecutor explained that Norma Jean Williams "vacillated greatly in her explanations to us about the death penalty." Indeed, during voir dire, Williams stated that the death penalty "wasn't working," "[was] placed upon black people when it is not placed upon other people," and strongly blamed "the system as a whole" for the disproportionate impact of capital punishment on blacks. She also said that the prosecution would have "to do a bang-up job," and that the defense would have to "just drop the ball," in order for her to be convinced that the defendant deserved the death penalty, adding at one point that she would require "more than the law says."
Although stating once that she would not impose the death penalty for a murder committed during an armed robbery, Williams later indicated she could consider the death penalty in some armed robbery-murder situations. Even so, this potential *997 juror's deeply held opinions concerning the death penalty, and her great reluctance even to consider capital punishment for a killing during an armed robbery, provide racially neutral reasons supporting the exercise of a peremptory challenge. See State v. Griffin, 618 So.2d 680 (La.App. 2d Cir.1993), writ denied, 625 So.2d 1063 (La.1993); State v. Young, 569 So.2d 570 (La.App. 1st Cir.1990), writ denied, 575 So.2d 386 (La.1991).
In explaining the challenge of Deborah Williams, the prosecutor pointed to the acute health problems of the potential juror's child and her attitude toward the death penalty. The venireperson testified about her one-year-old "premature" child "on a heart monitor and asthma machine," and her usual practice of calling home three times daily to check on him. While Williams indicated she could consider the death penalty, the assistant district attorney observed that she would "kind of screw her face up and say `Well, I think I could.'"
The prosecutor stated that Shernika Nedd had been excused because she "said ... she really couldn't return a death penalty in an armed robbery or murder case despite the fact that [the defense attorney] rehabilitated her," and, also, because she knew both the defendant and Randy Thomas. When first questioned, the prospective juror flatly stated, "I don't believe in the death penalty," but then indicated she could consider capital punishment in a rape-murder situation but not in an armed robbery-murder. When later presented a hypothetical by defense counsel, Nedd admitted she could consider the death penalty under those specific circumstances. She also disclosed having been "raised up together" with Randy Thomas, and that she knew defendant from his visits to her cousin's house.
Knowledge of the defendant is a sufficient race-neutral reason for a peremptory challenge, State v. Hampton, 27,703 (La. App.2d Cir. 02/28/96), 670 So.2d 1349, writ denied, 96-1063 (La.11/15/96), 682 So.2d 758, as is the fact that a juror understandably would be concerned about her child's serious health problems during trial. Cf. State v. Griffin, supra.
The prosecutor thus offered a race-neutral explanation for each of the three strikes, and the defense failed to show that the state engaged in purposeful discrimination. The trial judge, advantaged by observing the characteristics and demeanor of the attorneys and prospective jurors, occupies the best position for deciding whether a discriminatory objective underlies peremptory challenges. See State v. Banks, 96-652 (La. App. 5th Cir. 01/15/97), 694 So.2d 401. For that reason, the conclusions of the district court merit great deference. State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir.1991), writ denied, 594 So.2d 1317 (La.1992), and authorities therein. Clearly, no error arises from the overruling of the Batson objections here. All four assignments of error are without merit.

ASSIGNMENT OF ERROR NO. 7
This assignment challenges the admission of defendant's transcribed statement into evidence, after the corresponding audio tape had been lost. It is argued that the recording itself constituted the "best evidence."
Mike Christian and Greg Hall, investigators with CPSO, tape-recorded much of defendant's first interview. The transfer of the tape to the Caddo Parish District Attorney's Office subsequently occurred sometime in 1994, after a clerk in CPSO prepared a transcript. When defendant moved to make copies of the tape in January 1995, the DA's office could not locate it. Thereafter, based upon an extensive pretrial hearing, the district court ruled to admit the transcript over defendant's objection. At trial, after being informed that the tape had been lost, the jury listened to a reading of the twenty-page document.
Contrary to defendant's assertions, the best evidence rule does not mandate production of an original taped statement when testimony shows the item has been lost or destroyed and there is no bad faith by the state. La. C.E. arts. 1002, 1004; State v. McDonald, 387 So.2d 1116 (La.1980), cert. denied, 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980); State v. Hayes, 585 So.2d 619 (La.App. 2d Cir.1991). Whether the contents correctly reflect the original *998 statement is an issue for the fact-trier. La. C.E. art. 1008.
Here, the uncontroverted evidence at the pre-trial hearing established that the tape had simply been misplaced. Testimony amply demonstrated that an exhaustive search had been conducted without avail and that no wrongdoing or bad faith could be discovered.
Similarly, we are unimpressed with defendant's complaints about claimed inaccuracies and the unverified nature of the tape. Although neither the transcriptionist nor the two investigators directly compared the tape with the completed document, both Deputies Hall and Christian confirmed the transcript's accurate recreation of the statement, based upon reviews they respectively conducted approximately two days and two to three weeks after the interview itself. Transcription occurred the day after the recording had been made, and the transcribing clerk described her careful procedure for reducing such statements to writing. In addition to defendant's failure to specify the inaccuracies claimed, the transcript shows that the few inaudible responses are insignificant. Finally too, in light of the Deputy Christian's testimony concerning defendant's identical admissions made even before the taping occurred, see La. C.E. art. 801 D(2)(a), no prejudice has been shown to arise from the duplicative transcript. See La. C.Cr.P. art. 921. Under these circumstances, this assignment of error has no merit.

ASSIGNMENT OF ERROR NO. 8
In this assignment, defendant complains that the trial judge sustained the state's objection to questions regarding juror Vada Kirk's position on affirmative action.
During voir dire, the defense explored the issue of racial bias with this prospective juror, who eventually served on the panel. In furtherance of that probe, the questions sought her employment history, including whether she had supervised or been supervised by black persons. After inquiring about her thoughts regarding David Duke, defense counsel turned to affirmative action:
Counsel: How do you feel about affirmative action?
Juror: Really don't know that much about it. Just what they are talking about, because I haven't been concerned with that.
Counsel: Have you ever known anyone who has benefitted from affirmative action?
Upon objection by the state, the court declared the question improper. Defendant then objected, but also continued to elicit the juror's thoughts on school integration, black crime in general, and black crime in Shreveport. It is now argued that the trial court incorrectly limited defense questioning regarding affirmative action.
An accused has a constitutional right to a full and complete voir dire examination. La. Const. Art. I, § 17. Even so, the scope of examination lies within the sound discretion of the trial court, and its rulings will not be disturbed by the reviewing court absent clear abuse of that discretion. State v. Roy, 95-0638 (La.10/04/96), 681 So.2d 1230, 1240. While limitations of voir dire may not be so restrictive as to deprive counsel of a reasonable opportunity to determine grounds for challenges for cause and the intelligent exercise of peremptory challenges, an appellate court should undertake a review of voir dire as a whole in deciding whether the defendant has been afforded sufficient latitude in examining potential jurors. State v. Hamilton, 92-1919 (La.09/05/96), 681 So.2d 1217.
In this matter, defense counsel questioned the prospective juror in many areas where racial bias might appear. In particular, he asked about political and social issues with racial overtones, such as integration and whether or not her grandchildren had any black friends. Considering the leeway granted counsel and the uniformly non-racist answers elicited, defendant has failed to show that the trial judge abused his wide discretion concerning the limitation at issue. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 9
This final assignment asserts that the trial court erred in overruling a Motion to Reconsider, *999 after imposing consecutive sentences despite defendant's low intelligence and lack of criminal history.
In reviewing excessive sentence assertions, an appellate court utilizes a two-step process. First, the record must show adequate consideration of the criteria set forth in La.C.Cr.P. art. 894.1. State v. Smith, 433 So.2d 688 (La.1983). Remand is unnecessary, however, when a sufficient factual basis for the sentence is clearly shown. State v. Lanclos, 419 So.2d 475 (La.1982). Important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981).
The second inquiry concerns whether the incarceration is too severe considering the circumstances of the case and the background of the defendant. A sentence violates La. Const. Art. 1, § 20 if grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is considered grossly disproportionate when the crime and punishment, viewed in light of the harm done to society, shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985).
In imposing consecutive hard labor sentences of forty years and life imprisonment without benefit of parole, probation, or suspension, the trial judge complied with La. C.Cr. Pr. art. 894.1 by considering each appropriate factor, including aggravating and mitigating circumstances and defendant's first-felony status. The court also noted the risk of death or great bodily harm to more than one person created by defendant's conduct, the violent nature of the crime, and the concealment of the armed robbery through the murders.
Nor are the sentences excessive. Despite defendant's first-felony status and limited intellect, he participated as a principal in the senseless and vicious murders of a father and son during an armed robbery. The murder of Glenn Lacobee, who never attempted to resist the masked robbers, is especially heinous. Although Jackson claims that he hid when the shooting of this victim occurred, police located his palm prints near the point of the homicide. From these facts, defendant's involvement in these two most serious violations certainly justifies the maximum sentences. As a whole, the conduct portrayed grossly outweighs the claimed mitigating factors.
Further, it is within a trial court's discretion to order sentences to run consecutively. State v. McCray, 28,531 (La. App.2d Cir. 08/21/96), 679 So.2d 543; State v. Coates, 27,287 (La.App.2d Cir. 09/27/95), 661 So.2d 571, writ denied, 95-2613 (La.02/28/96), 668 So.2d 365. Concurrent sentences arising out of a single cause of conduct are not mandatory, State v. Pickett, 628 So.2d 1333 (La.App. 2d Cir.1993), writ denied, 94-0348 (La.05/20/94), 637 So.2d 476; State v. Nelson, 467 So.2d 1159 (La.App. 2d Cir.1985), and consecutive sentences under those circumstances are not necessarily excessive. State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980); State v. Williams, 445 So.2d 1171 (La.1984). All factors are to be considered. State v. Ortego, supra. These include the gravity or dangerousness of the offense, State v. Adams, 493 So.2d 835 (La.App. 2d Cir.1986), writ denied, 496 So.2d 355 (La. 1986); the viciousness of the crimes, State v. Clark, 499 So.2d 332 (La.App. 4th Cir.1986); and the harm done to the victims, State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ denied, 435 So.2d 433 (La.1983).
Considering these factors and in particular defendant's apparent disregard for human life, we find no merit in defendant's excessive sentence claim.
This assignment of error is without merit.

CONCLUSION
Finding neither merit in any of Jackson's claims nor patent error, we affirm defendant's convictions and sentences.
AFFIRMED.
NOTES
[1] The state charged all three robbers with the homicides. In State v. Thomas, 28,790 (La. App.2d Cir. 10/30/96), 683 So.2d 1272, this court previously affirmed one participant's convictions.
[2] Pursuant to the plea bargain colloquy in Thomas, supra, we indicated that David Lacobee fired the first shot. Mrs. Lacobee testified in the present trial, however, that Randy Thomas shot first.
[3] Following that ruling, defendant sought writs in State v. Jackson, 28,624-KW (La.App.2d Cir. 01/19/96), which we denied on the showing made due to the availability of an adequate remedy on appeal.
[4] The trial court had previously denied a challenge for cause directed at Nedd.