807 So.2d 316 (2001)
STATE of Louisiana
v.
Bryan Neville LOPER.
No. 00-KA-1936.
Court of Appeal of Louisiana, Fifth Circuit.
December 26, 2001.
*318 Harry J. Morel, Jr., District Attorney, Kim McElwee, Assistant District Attorney, Hahnville, LA, Attorneys for Plaintiff/Appellee.
Margaret S. Sollars, Thibodaux, LA, Attorney for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and WALTER J. ROTHSCHILD.
THOMAS F. DALEY, Judge.
The defendant, Bryan Loper, has appealed his conviction of armed robbery and the 70-year sentence imposed. For the reasons that follow, we affirm.

*319 FACTS:
At trial, Scott Adams testified that on September 9, 1999, he was working as the manager of the Norco branch of Hibernia National Bank in St. Charles Parish. About 10:00 a.m. two men entered the bank and told everyone inside to get on the floor. Mr. Scott explained that one robber, who was holding a .38 caliber revolver, went behind the teller area and demanded money. He took money from the teller drawers. The other robber, holding a 9-mm handgun stayed in front of the counter. Minutes later, the men left the bank. Mr. Adams testified that thirty-five or thirty-six thousand dollars was taken.
Mr. Adams testified that the man behind the counter was wearing a blue and white striped shirt, dark pants, a dark baseball cap, and a ski mask that covered half of his face. He was between 6 feet and 6 feet, 2 inches tall. The second man stood 5 feet, 9 inches tall. He wore gold-rimmed sunglasses and a red baseball cap.
Donna Victor, a cashier at a Dollar General Store located behind the bank, testified that she looked through the store's window and saw two men enter the bank with bandanas over their faces. She called 9-1-1 and reported that she believed the bank was being robbed. While still on the telephone with the 9-1-1 operator, she saw the men exit the bank and run across the street and into and open field. She saw one of the men drop something in the field that emitted a cloud of red dust. Ms. Victor reported that one man was wearing a blue and white striped T-shirt, and the other wore a white T-shirt.
Patti Waguespack, a customer at the Dollar General Store, testified that she saw two men run from the bank and into a grassy field. One was carrying a bank bag and the other was holding an unknown object. Both men were African-American. One wore a blue and white striped shirt, and the other wore a white shirt and blue jeans.
Carol Dufrene testified that as she was driving in the area of the bank, she saw two men running from an empty lot. One of the men, who was wearing white canvas gloves, was making odd gestures with his hands. She testified that she saw a white Toyota 4-Runner parked nearby with a man lying down in the driver's seat. After she passed the vehicle, she looked in her rear-view mirror and saw the first two men emerge from the lot and get into the 4-Runner. Ms. Dufrene explained that a short time later she pulled into the bank's parking lot where she saw a police officer. She approached the officer and gave him a description of the vehicle she had seen.
Lieutenant Edward Noel of the St. John the Baptist Parish Sheriffs Office testified that he spotted the described vehicle on Highway 61 in LaPlace. Lieutenant Noel testified that he stopped the vehicle, and other officers arrived at the scene and arrested the suspects.
Sergeant Billy LeBlanc testified that he was dispatched to the scene of the arrest in LaPlace. He found the white Toyota 4-Runner parked at the intersection of First Street and Highway 48. He saw what appeared to be red dye on the driver's side door handle of the vehicle. It was the same color as the dye that was found on the stolen money. He collected various items from inside the vehicle, including a revolver loaded with six live rounds, a 9-mm pistol with a magazine containing 13 live rounds, gold-rimmed sunglasses, a white T-shirt and a striped shirt stained with red dye, a long-sleeved Old Navy brand shirt with a red stain, two baseball caps, face masks, and a pair of garden gloves. Mr. Adams was brought from the bank to the scene of the arrest, and was *320 able to identify some of the items as those used by the robbers.
LeBlanc testified that he recovered a plastic Foot Locker shopping bag containing $35,700.00 in cash. The bag was lying in the vacant lot across from the bank. The dye packet was inside the bag with the money, and the money was covered in dye.
Charles Holmes testified that defendant, Bryan Loper, is his cousin, and that Ronnie White is a friend of his. At 9:00 a.m. on of September 9, 1999, White picked up Holmes from his home in LaPlace. Defendant was also inside the vehicle. The three men went to Norco where White parked the vehicle on Good Hope Street. Defendant and White exited, leaving Holmes in the front passenger seat. Defendant returned to the truck after about four minutes. White returned shortly thereafter, covered in a red substance. Defendant and White said they had tried to rob the bank. Holmes testified that defendant drove the vehicle back to LaPlace, where they were stopped and arrested.
Agent Barbara O'Donnell of the F.B.I. testified that the St. John the Baptist Sheriff's Office contacted her on September 9, 1999 and gave her information about the Hibernia robbery. She was told that defendant was in custody, and that he did not want to talk to local officers. Agent O'Donnell testified that she and Agent Kelly Bryson interviewed defendant that day at the St. John Sheriffs Office. O'Donnell testified that she advised defendant of his rights using an F.B.I. Advice of Rights form. Defendant read and signed the form, indicating that he understood his rights, and wished to waive them and make a statement. Defendant's interview was not recorded, as per F.B.I. policy. Agent O'Donnell took notes during the interview, and later based her report on those notes.
O'Donnell testified that defendant admitted he had gone to the bank with two other men that morning with the intention of committing a robbery. Defendant and Ronnie White went into the bank armed and wearing masks, while leaving Charles Holmes in the vehicle. O'Donnell testified that defendant stated that once inside the bank, he stayed in front of the tellers' counter, giving directions to the tellers and the other perpetrator. Defendant then explained that they exited the bank first and ran through a field to the vehicle. The money was abandoned in the field when a dye packet exploded inside the bag. O'Donnell testified that the defendant stated that they fled in their vehicle.
Agent O'Donnell identified the photographs taken by the bank's security camera at the time of the robbery. She identified defendant as one of the subjects in the photos, and White as the other man pictured.
Detective Walter Fonseca of the St. Charles Parish Sheriff's Office monitored defendant's interview over closed-circuit television. He testified that the F.B.I. agents advised defendant of his rights prior to questioning him. According to Fonseca, defendant told the agents that he and Ronnie White discussed robbing a bank, and that defendant told White there was a bank in Norco that would be an easy target. His testimony regarding the defendant's statement mirrored that of Agent O'Donnell.
At the conclusion of trial, the defendant was found guilty of armed robbery and sentenced to 70 years in prison without the benefit of parole, probation, or suspension of sentence. This appeal followed the denial of his Motion for New Trial.

*321 ASSIGNMENT OF ERROR NUMBER ONE

By this assignment, defendant argues that the trial court erred in denying his Motion to Suppress Statement, as his confession to federal agents was obtained under false pretenses.
Before a defendant's confession or inculpatory statement may be introduced as evidence, the State must affirmatively show that the statement was made freely and voluntarily and was not made under the influence of fear, duress, threats, intimidation, or promises. LSA-R.S. 15:451; LSA-C.Cr.P. art. 703D; State v. Broadway, 96-2659, (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000). Additionally, the State must establish that an accused who makes a statement during custodial interrogation was first advised of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The test for voluntariness involves a review of the totality of the circumstances under which the statement was given. The offer of an inducement is only one factor in that analysis. State v. Lavalais, 95-320, p. 6 (La.11/25/96), 685 So.2d 1048, 1053, cert. denied, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997).
The trial court's decision as to the credibility and weight of testimony relating to the voluntariness of the confession is entitled to great weight and will not be overturned on appeal unless it is not supported by the evidence. State v. Quest, 00-205 (La.App. 5 Cir. 10/18/00), 772 So.2d 772. In determining whether the trial court's ruling on a defendant's Motion to Suppress is correct, an appellate court is not limited to the evidence adduced at the suppression hearing; it may also consider the evidence presented at trial. State v. Raines, 00-1941, (La.App. 5 Cir. 5/30/01), 788 So.2d 635.
Defendant asserts that F.B.I. agents assured him prior to interviewing him that he would be charged in the federal court system, and not by local authorities. He further contends that he consented to be interviewed based on the agents' promises, and that he would not have given a statement had he known he would be prosecuted in State court. Additionally, defendant complains that the agents did not inform him that his statement could be used against him in a State prosecution. Therefore, defendant argues, his statement was not voluntarily and knowingly made.
At the suppression hearing, F.B.I. agent Barbara O'Donnell testified that she was asked to participate in the armed robbery investigation by the Sheriff's offices in St. John and St. Charles parishes. Sheriff's deputies informed her that defendant only wished to speak to F.B.I. officers. O'Donnell questioned defendant on the afternoon of September 9, 1999, shortly after his arrest. Agent Kelly Bryson was also present during the interview.
O'Donnell testified that before questioning defendant, she verbally advised him of his rights, using a standard Advice of Rights form, which reads as follows:
Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have a lawyer with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

*322 If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
Defendant's initials appear at the end of each statement listed on the form. At the bottom of the form is a Waiver of Rights statement. Defendant's signature appears there. The form also bears the signatures of agents O'Donnell and Bryson.
Agent O'Donnell testified that she did not threaten or coerce defendant, nor did she promise him anything in order to obtain a confession. She testified that she told defendant she would do everything she could to ensure that the cases were tried in federal court. However, she testified that she made it clear to defendant that she could not promise the case would be accepted for federal prosecution.
Agent Bryson testified at trial that defendant was advised of his rights, and that he was not promised anything in exchange for a confession. At trial O'Donnell again testified that she advised defendant of his rights, and that no promises or threats were made in order to coerce a statement.
At the suppression hearing, defendant testified that at the time of the interview, he believed the case was going to be handled by the federal government. He stated that O'Donnell did not tell him his case might be prosecuted in State court, but he was told that with his cooperation, it was "more than likely" that the federal government would take the case. Defendant testified that, had he known his case was going to be prosecuted by the State, he would not have signed the Advice of Rights form. On cross-examination, defendant admitted that Agent O'Donnell did not give him any promises.
At the suppression hearing Detective Fonseca testified that defendant did not specifically say that he did not want his case tried in State court. Fonseca testified that it was his understanding that defendant simply did not want to be interviewed by anyone other than the F.B.I.
Defendant further asserts that he would not have given a statement had he known Detective Fonseca was observing the interview from another room. At the motion hearing, Agent O'Donnell testified that she did not know at the time of the interview that Fonseca was listening. However, she testified at trial that she told defendant that anything he told her would be shared with local law enforcement.
Our review of the totality of the circumstances indicates that the trial court did not err in denying the Motion to Suppress. The F.B.I. agents involved both testified that defendant was promised nothing in exchange for making a statement. Defendant himself concedes in his brief that "Agent O'Connell [sic] never made a guaranteed promise." Agent O'Donnell's assurance that she would do her best to see that defendant's case was tried in federal court did not equate to an improper inducement or promise. See, State v. Lavalais, supra. The record indicates that defendant was advised of his rights and of the fact that any statements he made could be used against him in court. The record further shows the State met its burden of proving that defendant understood his rights, and that he voluntarily and knowingly waived them. This Assignment of Error has no merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his Second Assignment of Error, defendant argues that the State violated his right to a fair trial by using peremptory challenges to systematically exclude African-Americans from the jury. The Equal Protection Clause of the Fourteenth Amendment guarantees that criminal defendants have the right to be tried by a jury selected by nondiscriminatory criteria. *323 It is well established that the use of peremptory challenges based solely on a juror's race is prohibited. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
When a defendant makes a Batson challenge, claiming the State has used peremptory challenges in a manner, which violates the Equal Protection Clause, the defendant must first make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of a juror's race. State v. Jackson, 29,470 (La. App. 2 Cir. 8/20/97), 707 So.2d 990. If the defendant fails to make a prima facie case, then the challenge fails. If a prima facie case is established, the burden shifts to the State to come forward with a race-neutral explanation for its peremptory challenges. If a race-neutral explanation is tendered, then the trial court must determine whether the defendant has established purposeful discrimination. Batson, supra.
In determining whether a defendant has met his burden of showing purposeful racial discrimination in the State's exercise of peremptory challenges, the proper question is whether the proof offered by the defendant, when weighed against the State's proffered "race-neutral" reasons, is strong enough to persuade the trier of fact that the claimed discriminatory intent is present. State v. Toussaint, 98-1214 (La.App. 5 Cir. 5/19/99), 734 So.2d 961, writ denied, 99-1789 (La.11/24/99), 750 So.2d 980. A trial judge's determination on a claim of purposeful discrimination rests largely on credibility evaluations, so those findings are entitled to great deference by the reviewing court. State v. Jones, 00-162 (La. App. 5 Cir. 7/25/00), 767 So.2d 862, writ denied, 00-2484 (La.6/22/01), 794 So.2d 783.
Defendant complains of the State's excusal of African-Americans Ernest Weber, Craig Scott, and Wendell Jones. Mr. Weber and Mr. Scott were called in the first voir dire panel. In response to questioning, Mr. Scott said he knew Ms. Williams, defendant's attorney, because he went to high school with her. He further stated that his and Ms. Williams' family knew each other. He did not, however, socialize with her. Mr. Scott further stated that his sister-in-law had been convicted of bank robbery in St. Charles Parish three years earlier, and that he believed she was treated unfairly. Although Scott said he would be able to follow the law as instructed, he stated that his sister-in-law's experience would make him more inclined to hold the prosecution to a higher standard of proof in defendant's case.
Mr. Weber also said he knew defense counsel. He went to school with Ms. Williams' sister and he knew her parents, although he had not socialized with them in some time. Mr. Weber stated his cousin was convicted of armed robbery in St. John Parish, and that he was serving a life term. Weber said he believed his cousin was guilty, and that he deserved the punishment he received.
Mr. Weber stated he would want the State to produce the gun defendant was alleged to have used to commit the robbery, or he would not be able to find defendant guilty. He explained that if the State did not produce a weapon, it would have to produce some other significant evidence before he could vote to convict.
The prosecution used a peremptory challenge to excuse Mr. Weber. Defense counsel objected, making a Batson challenge. Ms. McElwee, the prosecutor, argued that Mr. Weber was the second African-American she had challenged, but that there was already one African-American seated on the jury. The judge asked Ms. McElwee to proffer a race-neutral explanation *324 for the challenge. She responded by saying she did not feel she could allow Weber to sit on the jury because his cousin had been convicted of armed robbery, and because he said he would require the State to produce the weapon used in the robbery. The judge ruled that the prosecutor's explanation was satisfactory, thereby denying the Batson challenge.
When the prosecutor used a peremptory challenge to exclude Mr. Scott, the defense again made a Batson objection. The prosecutor explained that she was concerned that Scott would require the State to produce an eyewitness to the offense, and that he would hold the State to an unlawfully high burden. Scott's sister-in-law had been convicted of robbery, and he felt she had been treated unfairly. The prosecutor also argued that Scott's demeanor indicated he was unhappy to be in court. The judge denied the Batson claim, and allowed the peremptory challenge.
The third juror defendant complains was wrongfully excluded was Wendell Jones, who was part of the second panel of prospective jurors. During voir dire, he stated that he went to school with Ms. Williams, but did not socialize with her. Jones said he would weigh the evidence impartially despite the fact that he had gone to school with Ms. Williams. When the State used a peremptory challenge to excuse Jones, the defense made another Batson objection. The prosecutor stated she wanted to exclude Mr. Jones because he knew Ms. Williams from high school, and she feared he would not be impartial. The court accepted this as a race-neutral explanation, and allowed the State's challenge to stand.
Our review of the jurisprudence indicates the trial court did not err in finding the prosecutor's explanations with regard to jurors Scott, Weber, and Jones to be race-neutral, thereby denying the defendant's Batson challenges. In State v. White, 96-0592 (La.App. 1 Cir. 12/20/96), 686 So.2d 96, the court found the State's challenge of a juror who was acquainted with the defense attorney to be race-neutral. The Louisiana Supreme Court has found that the fact that a family member is a convicted criminal is a race-neutral reason for excluding a prospective juror. State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990).
Additionally, both Mr. Weber and Mr. Jones gave responses that indicated they would have reservations about following the law in weighing the evidence. It is well settled that jurors exhibiting reluctance either to be bound by the law or to apply it as instructed are properly excused and that such reluctance constitutes a race-neutral reason for exercising a peremptory challenge. State v. Payne, 94-1114 (La.App. 4 Cir. 6/7/95), 657 So.2d 531.
Accordingly, we find defendant's Second Assignment of Error to be without merit.

ASSIGNMENT OF ERROR NUMBER THREE
In his Third Assignment of Error, the defendant alleges that the 70-year sentence imposed is harsh and excessive. Defendant filed a Motion to Reconsider Sentence on August 18, 2000.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, (La.1992). Even a sentence which falls within statutory limits may be excessive *325 under certain circumstances. State v. Robicheaux, 412 So.2d 1313 (La.1982).
A Pre-sentence Investigation Report was completed prior to defendant's sentencing, and was reviewed by the court. The State also produced a certified copy of defendant's juvenile conviction for attempted first-degree murder. Upon sentencing defendant to a prison term of 70 years, the judge stated that he reviewed the pre-sentence report that contained letters from the victim and one letter from the defendant. The judge further stated that he considered the witness' testimony, as well as the documentary evidence submitted at trial. The judge noted that he found defendant in need of correctional treatment in a custodial environment and that a lesser sentence would deprecate the seriousness of the offense. The judge stated that he did not feel that defendant had the potential for rehabilitation. The court found that defendant used deliberate cruelty in threatening violence against the victims during the course of the robbery. Defendant knowingly risked the victims' injury or death.
Defense counsel asked the court to consider as a mitigating factor that defendant had cooperated with authorities by making a full confession. Counsel added that defendant is the father of four children, and that they would suffer if he were to serve a long prison sentence. She further argued that, while defendant's list of arrests was extensive, he only had one prior felony conviction. Prior to trial, defendant was offered a ten-year sentence in exchange for a guilty plea, but he refused the offer. Counsel argued that the court should use the plea offer as a guide in sentencing defendant. The prosecutor countered by saying that the ten-year offer was withdrawn after defendant lied under oath about his and his cousin's involvement in the robbery. The prosecutor added that she would not have made defendant a plea offer had she known of his juvenile conviction.
The sentencing range under LSA-R.S. 14:64 is 10 to 99 years. Defendant's sentence is near the upper end of that range. Considering defendant's criminal record, the seriousness of his juvenile conviction, and the fact that he carefully plotted and fully participated in the instant robbery, we find the trial court did not abuse its sentencing discretion. This Assignment of Error is without merit.
The record was reviewed for errors patent in accordance with LSA-C.Cr.P. article 920. The review reveals no errors patent in this case.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.